1
2
3
4
5
6
7
8 # UNITED STATES DISTRICT COURT

9 EASTERN DISTRICT OF CALIFORNIA

10

11 LARRY EUGENE MCDONALD,

Plaintiff,

Case No. 1:16-cv-01477-SKO

12

v.

13

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

NANCY A. BERRYHILL,
14 Acting Commissioner of Social Security,[1]

15 Defendant.

(Doc. 1)

16

17

_____/

18

19 ## I.     INTRODUCTION

20

On October 3, 2016, Plaintiff Larry Eugene McDonald ("Plaintiff") filed a complaint
21
under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the
22
Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application
23
for Disability Insurance Benefits ("DIB").  (Doc. 1.)  The matter is currently before the Court
24
on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.
25

26

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration.
27 *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore
substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20
28 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper
defendant").

Oberto, United States Magistrate Judge.[2]

## II.  BACKGROUND

Plaintiff was born on June 13, 1958, graduated from high school, and attended college for one year.  (Administrative Record ("AR") 252, 360.)  He previously worked as a security guard, gate guard, tax examiner, technical support specialist, airframe and powerplant mechanic, and officer manager (government service).  (AR 82-85; *see also* AR 39-40.)  Plaintiff previously filed for a period of disability on June 15, 2007—following an incident where he was allegedly struck by a truck while working on a naval base—which was denied after a hearing on May 14, 2009.  (AR 96-105, 1131, 1168.)  Plaintiff did not appeal the decision to the district court.

On November 28, 2011, Plaintiff protectively filed the instant application for DIB payments due to depression, post-traumatic stress disorder, seizures, epilepsy, asthma, hypertensive cardiovascular disease, hypertension, severe back pain, left and right knee impairment, hip pain, left shoulder pain, and bone spur in the left heel.  (AR 251-58, 359.)  Plaintiff subsequently amended his alleged onset date to August 27, 2009, the date following the prior unfavorable decision.  (AR 360; *see also* Doc. 9 at 5.)

### A.  Relevant Medical Evidence[3]

#### 1.  Lorie DeCarvalho, Ph.D.—Treating Psychologist

From October 2008 to April 2012, Plaintiff received weekly psychotherapy treatment and psychotropic pain medication management for PTSD, depression, and pain disorder from clinical psychologist Lorie DeCarvalho, Ph.D.  (AR 1014; *see also generally* AR 495-720, 768-983.)  On August 10, 2009, Plaintiff reported a decrease in his symptoms related to PTSD as a result of his treatment.  (AR 717.)  On August 17, 2009, Plaintiff returned to Dr. DeCarvalho, appearing visibly shaken from a nightmare he had the night before.  (AR 715.)  Dr. DeCarvalho examined Plaintiff, and noted a repressed emotional state and intrusive images.  (*Id.*)  On August 31, 2009,

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 4, 5.)

[3] As Plaintiff's assertion of error is limited to the Administrative Law Judge's discrediting of Dr. Lorie DeCarvalho's opinion concerning Plaintiff's mental function limitations, her discrediting of Plaintiff's subjective complaints, and her purported failure to consider Dr. Greg Hirokawa's opinion, only evidence relevant to those arguments is set forth below.

Plaintiff reported that he was doing "okay," but Dr. DeCarvalho noted that Plaintiff was "stable but very forgetful," and instructed him to return in one to two weeks. (AR 711.)

Plaintiff returned to Dr. DeCarvalho several times in September 2009. Each time, Plaintiff reported that he was doing "okay" or "alright." (AR 703, 705, 709.) During one of the visits that month, Plaintiff reported having flashbacks of his experiences in the Navy. (AR 709.) After each visit, Dr. DeCarvalho noted that Plaintiff was "stable." (AR 703, 705, 709.)

However, during the months from December 2009 through May 2010, Plaintiff reported that his medications were not helping, and that he continued suffering flashbacks and seizures. (AR 657, 667-69, 673, 675, 681, 685.) At Plaintiff's February 2010 visit, Dr. DeCarvalho assessed his condition as stable with a decrease in his anxiety symptoms. (AR 677.) Plaintiff's April 2010 examination revealed pressured speech, feelings of guilt, maladaptive thought processes, and reports of continued seizures and flashbacks. (AR 663-69.) In May 2010, Dr. DeCarvalho had Plaintiff admitted to the hospital due to "grave disability" and a Global Assessment of Functioning ("GAF") score of 25.[4] (AR 657.)

During Plaintiff's hospitalization, it was noted that he was "alert and oriented times three," "very cooperative," and that he had coherent thought processes and intact cranial nerves. (AR 1122-23.) Plaintiff's medications were adjusted, which resulted in improved mood, "remarkable good improvement," and "good progress toward the end of the hospitalization." (AR 1117-23.) Plaintiff was discharged in stable condition. (*Id.*)

In June 2010, following his hospitalization, Plaintiff reported that he was no longer having nightmares. (AR 655.) Plaintiff remained stable throughout the month. (AR 651-53.) However, in July and August 2010, Plaintiff reported having nightmares again, as well as flashbacks. (AR 641-49.) Dr. DeCarvalho admitted Plaintiff to the hospital on August 25, 2010, due to seizures, sleeplessness, and nightmares. (AR 639.) On August 31, 2010, Plaintiff reported

---

[4] Global Assessment of Functioning is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic Statistical Manual of Mental Disorders at 34 (4th ed. 2000) ("DSM IV–TR"). A GAF of 21-30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). *Id.*

having nightmares approximately three times per week, and his nightmares and flashbacks continued through September 2010. (AR 635, 637.) On September 24, 2010, Dr. DeCarvalho submitted a letter assessing Plaintiff's progress as minimal to moderate (AR 33, 1168).

Plaintiff returned to Dr. DeCarvalho in November 2010, and reported doing "alright." (AR 607, 870.) Plaintiff expressed frustration with his neurologist and with the possibility of losing his driver license. (*Id.*) Dr. DeCarvalho assessed Plaintiff as stable. (*Id.*)

From January through mid-March 2011, Plaintiff continued reporting nightmares and flashbacks to his military experience. (AR 583-93.) From late March through April 2011, Plaintiff reported a stable mood, and he was taking a reduced dosage of his medications. (AR 573-75, 581.) Plaintiff's mood worsened at the end of April—he was experiencing intrusive thoughts—but his mood stabilized shortly thereafter. (AR 565-71.)

On May 19, 2011, Plaintiff reported to Dr. DeCarvalho that he was doing "pretty good," and that he had been gardening to distract himself from his nightmares and flashbacks. (AR 565.) Plaintiff reported that his communications with his family had improved. (*Id.*) Dr. DeCarvalho assessed that Plaintiff was stable. (*Id.*)

In August 2011, Plaintiff reported to Dr. DeCarvalho that he had discontinued his medications due to side effects, including limb weakness, lethargy, decreased appetite, and upset stomach.[5] (AR 557.) That same month, and through September, Plaintiff reported having "blackouts," as well as intrusive images and physical pain. (AR 549, 557.)

On October 19, 2011, Dr. DeCarvalho noted that Plaintiff's symptoms had improved with the combination of medication and psychotherapy, but that he continued to experience PTSD and he reported having more seizures when exposed to physical or emotional stress. (AR 1014). Dr. DeCarvalho opined that, with regard to returning to a viable career, Plaintiff's prognosis remained "fair to poor." (*Id.*) That is, Plaintiff would not be able to sustain employment or function in stressful work conditions, because he could not focus or perform activities for more than short periods of time—that if he returned to work, he would significantly regress and destabilize. (*Id.*)

---

[5] It is worth noting that, in June 2011, Plaintiff intimated that he could not afford to refill his Lyrica medication.

On December 6, 2011, Plaintiff reported to Dr. DeCarvalho that he was "doing good," but that he continued having flashbacks and dreams about his military experiences. (AR 769.) Dr. DeCarvalho diagnosed Plaintiff with PTSD, major depressive disorder, recurrent and moderate, and with a GAF score of 55 to 58. (*Id*.)

On December 21, 2011, Dr. DeCarvalho assessed Plaintiff's mental function limitations. (AR 1006-13.) She diagnosed Plaintiff with chronic PTSD and major depressive disorder. (AR 1006.) Dr. DeCarvalho found that Plaintiff was *moderately* limited in his ability to remember locations and work-like procedures, interact appropriately with the general public, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently. (AR 1009-11.) She found that Plaintiff was *markedly* limited, however, in the following remaining areas: understanding, remembering, and carrying out one or two step instructions and detailed instructions; maintaining attention and concentrating for extended periods, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, and sustaining an ordinary routine without supervision; working in coordination with or in proximity to others without being distracted by them, making simple work-related decisions, completing a normal workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; and being aware of normal hazards and taking appropriate precautions. (AR 1009-11.) Dr. DeCarvalho opined that Plaintiff was unable to handle even low stress, that his impairments would likely cause him to be absent from work more than three times per month, and that, as a result, Plaintiff was "not capable of holding regular employment." (AR 1012-13.)

In her evaluations of Plaintiff during January and February 2012, Dr. DeCarvalho assessed Plaintiff as psychologically stable, and as exhibiting fair insight and fair to good judgment. (AR 526.)

On March 1, 2012, Dr. DeCarvalho opined that Plaintiff was "psychologically stable," and that Plaintiff's mental health examination revealed normal grooming, good eye contact, normal speech, normal, logical, matter-of-fact thought process, normal perception, normal mood, good affect, normal attention, normal memory, fair insight, fair to good judgment, an alert and oriented affect, denied suicidal or homicidal ideation, and "happy" overall. (AR 497.) Dr. DeCarvalho diagnosed Plaintiff with PTSD, major depressive disorder, recurrent and moderate, and with a GAF score of 55. (AR 497.) On March 6, April 11, and April 25, 2012, Plaintiff reported to Dr. DeCarvalho that he was doing "good" and "alright," and she rendered the same assessment that she had rendered on March 1, 2012, with the exception of a GAF score of 58. (AR 1135, 1137, 1141.)

### 2.    reBecca Gibson, LCSW

Plaintiff was transferred from Dr. DeCarvalho to reBecca Gibson, LCSW, for ongoing treatment. (AR 1133.) On May 1, 2012, Plaintiff underwent a bio-psychosocial evaluation with Ms. Gibson. (*Id.*; *see also* AR 1167.) Ms. Gibson diagnosed Plaintiff with PTSD, chronic and moderate, panic disorder with agoraphobia, major depressive disorder, single episode and moderate, cognitive disorder not otherwise specified, pain disorder, and complex partial seizures, and a GAF score of 50. (*Id.*) Ms. Gibson recommended that Plaintiff receive psychotherapy once a week for eight weeks. (*Id.*) Ms. Gibson then saw Plaintiff on May 7, 2012, for an updated evaluation. (AR 1167.) On May 18, 2012, Plaintiff returned to Adventist Health, and it was noted that Plaintiff was not taking his medication Androgel consistently and not using his walker.[6] (AR 1146.)

//

//

---

[6] Plaintiff did not see Ms. Gibson during this particular visit at Adventist Health—he saw a different treatment provider. The last time Plaintiff saw Ms. Gibson was on May 7, 2012. (AR 1167.)

### 3. Ralph Lissaur, M.D.—Treating Psychologist

On September 29, 2009, Plaintiff presented at Adventist Health for a review of his medication by psychiatrist Ralph Lissaur, M.D. (AR 701.) Plaintiff reported nightmares and visual disturbances, but that he was "do[ing] well." (*Id*.) Dr. Lissaur opined that Plaintiff had normal mood, normal speech, good eye contact, euthymic mood, normal affect, linear thought process, and "improved spirits." (*Id*.) Dr. Lissaur diagnosed Plaintiff with PTSD, major depressive disorder in partial remission, panic disorder, and a GAF score of 50. (*Id*.) He recommended that Plaintiff continue his medications of Cymbalta and Lexapro, and that he continue supportive, cognitive behavioral, and insight oriented therapy. (*Id*.)

On January 14, 2010, Plaintiff returned to Dr. Lissaur, indicating that the VA "wouldn't [dispense] the meds" that Dr. Lissaur previously prescribed, and that he was again suffering nightmares, depression, and anxiety. (AR 617.) Dr. Lissaur diagnosed Plaintiff with major depressive disorder in partial remission, PTSD, panic, and a GAF score of 50. (*Id*.) Dr. Lissaur again prescribed Lexapro and Cymbalta. (*Id*.) Dr. Lissaur increased the dosage of Plaintiff's medications when Plaintiff returned on February 10, 2010, complaining of continued episodes of depression. (AR 615.)

On March 10, 2010, Plaintiff reported to Dr. Lissaur that his symptoms had improved, but that "the downs . . . are still there," and that he was easily exhausted. (AR 613.) Dr. Lissaur noted that Plaintiff had good eye contact, normal speech, linear thoughts, exhibited mild frustration, variable mood, poor insight and judgment, was depressed and anxious, and used a walker but had otherwise normal motor activity. (*Id*.) Dr. Lissaur observed that Plaintiff "identifies w[ith] the sick role." (*Id*.) Dr. Lissauer diagnosed Plaintiff with major depressive disorder in partial remission, PTSD, panic disorder, non-epileptic seizures, and a GAF score of 50, and he increased the dosage of Plaintiff's Cymbalta prescription. (*Id*.)

In May 2010, Plaintiff reported a general improvement in his symptoms, despite the recent death of his father and father-in-law. (AR 611.) Plaintiff reported that he was going to the gym. (*Id*.) Dr. Lissaur again increased Plaintiff's Cymbalta dosage. (*Id*.) In September 2010, Dr. Lissaur added Xanax to Plaintiff's medication treatment. (AR 514.) In November 2010,

Plaintiff reported no benefit from the Xanax, but added that over-the-counter medication had improved his sleep. (*Id.*)

### 4. David Pingitore, Ph.D., Q.M.E.

On January 19, 2010, Plaintiff underwent a psychological evaluation with David Pingitore, Ph.D., Qualified Medical Examiner, in connection with his worker's compensation claim. (AR 728.) Dr. Pingitore observed that Plaintiff's visual acuity was within normal limits, his hearing appeared to be normal, his sensory function gave no evidence of impairments, his motor skills were normal (despite his use of a walker), his speech was normal in rhythm and volume, his thought processes were logical and coherent, and his cognitive functioning was within average range. (AR 743.) Dr. Pingitore diagnosed Plaintiff with conversion disorder with mixed presentation, and a GAF score of 63. (AR 748.) Dr. Pingitore found that Plaintiff was temporarily partially psychiatrically disabled as a result of his motor vehicle accident injury, specifically from conversion disorder. (AR 752-53.) He further found that Plaintiff's psychological treatment was incorrectly directed toward symptoms associated with PTSD instead of conversion disorder. (AR 751.) Finally, he found that Plaintiff likely did not suffer any neuropsychological deficits and that whatever trauma he previously experienced was unrelated to the accident. (*Id.*) Dr. Pingitore concluded that Plaintiff could perform the clerical and computer-based aspects of his job, evidenced by his level of daily activity, and that his presentation and performance in the examination indicated the presence of cognitive skills that could be used in his usual job setting. (AR 752.) Dr. Pingitore recommended that Plaintiff's treating psychotherapist address Plaintiff's symptom exaggeration related to his conversion disorder. (AR 753.)

On January 18, 2011, Dr. Pingitore examined Plaintiff again. (AR 756.) Dr. Pingitore observed that although Plaintiff ambulated with a walker, he leaned on it only very lightly and the movement of his lower extremities was without impairment, pain, or abnormal gait. (AR 757.) Dr. Pingitore assessed that Plaintiff's "response style may indicate a broad tendency to magnify the level of experienced illness or a characterological inclination to complain or to be self-pitying . . . [and that] the patient's scale scores . . . may be somewhat exaggerated." (AR 761.) Dr.

Pingitore found that Plaintiff had no work restrictions related to psychiatric injury, and that Plaintiff had no temporary or permanent disability. (AR 766-67.)

### 5. State Agency Physicians

On December 18, 2012, Plaintiff underwent a psychiatric evaluation by clinical psychologist Greg Hirokawa, Ph.D., at the request of the state agency. (AR 1152.) Plaintiff reported feeling depressed, anxious, experiencing PTSD, sleep deprivation, mood swings, poor concentration, and problems with memory. (AR 1152.) Dr. Hirokawa noted that Plaintiff's mental health examination revealed fair hygiene, fair eye contact, fair appetite, normal motor activity, normal speech, intact, linear, logical thought processes, average fund of knowledge, intact recent and remote memory, adequate judgment, depressed mood, and poor sleep. (AR 1153-54.) Plaintiff was able to explain a proverb, perform mathematical calculations accurately, perform abstractions adequately, perform a simple three-step command, and concentrate adequately for conversation, but could not spell "world" backwards. (*Id*.)

Dr. Hirokawa diagnosed Plaintiff with anxiety disorder not otherwise specified, depressive disorder not otherwise specified, and assessed a GAF score of 55. (AR 1154-55.) He concluded that Plaintiff had *mild to moderate* impairment in his ability to follow simple instructions, follow complex or detailed instructions, maintain adequate pace or persistence to perform one- or two-step simple repetitive tasks and complex tasks, maintain adequate attention or concentration, interact appropriately with co-workers, supervisors, and the public on a regular basis, engage in social judgment and awareness of socially appropriate behavior, and function independently and sustain an ordinary routine without special supervision.[7] (AR 1155.) Dr. Hirokawa concluded that Plaintiff had *moderate* impairment in his ability to adapt to changes in job routine, withstand the stress of a routine workday, accept instructions from a supervisor and respond appropriately to criticism, and emotionally managing a work environment. (*Id*.)

On December 20, 2012, Plaintiff underwent a consultative examination with state agency internist Raman Verma, M.D. (AR 1159-66.) Plaintiff reported to Dr. Verma that for the past

---

[7] Dr. Hirokawa's report defines "mild" as "some limitations, but individual can generally function well," and "moderate" as "moderate limitation in this area, but the individual is still able to function satisfactorily." (AR 1155.)

year he was trying to manage his impairments without medication. (AR 1161-62.) Plaintiff stated that he was doing "okay." (AR 1162.)

On January 4, 2013, state agency reviewing medical consultant N. Haroun, M.D., reviewed the evidentiary record. (AR 149.) Dr. Haroun opined that Plaintiff had no cognitive limitations and no severe medically determinable mental impairments. (AR 149-50.)

**6.    Relevant Physical Impairment Evidence**

In October 2007, Qualified Medical Examiner Sanjay Deshmukh, M.D., examined Plaintiff. (AR 436-50.) Dr. Deshmukh found that Plaintiff had full range of motion in his right hip, and that Plaintiff experienced pain symptoms in his right hip symptoms only occasionally and slightly with prolonged periods of very heavy lifting, pushing, and pulling. (AR 449.) Dr. Deshmukh further found that Plaintiff had negative acetabular crush and negative acetabular apprehension. (*Id*.) Dr. Deshmukh opined that Plaintiff was capable of performing his usual and customary job. (AR 449-50.)

In February 2011, Plaintiff visited Malcolm Ghazal, M.D., and requested an electrical wheelchair or a walker with larger wheels to manage the pain in his hip. (AR 1359.) Dr. Ghazal refused Plaintiff's request, and reported that Plaintiff could ambulate without either a wheelchair or a walker with larger wheels. (*Id*.)

In August 2011, Plaintiff presented at Adventist Health concerning pain in his neck, shoulders, and back. (AR 1091-1109.) He reported that he had been using an over-the-counter Transcutaneous Electrical Nerve Stimulation ("TENS") unit to manage his pain, had ceased taking his prescriptions, and was stable. (*Id*.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for DIB payments initially on April 16, 2012, and again on reconsideration on January 18, 2013. (AR 110-38, 139-71.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 188-89.) At the hearing on January 6, 2014, Plaintiff appeared with an attorney, and testified before an ALJ as to his alleged disabling conditions. (AR 48-92.)

//

### 1. Plaintiff's Testimony

Plaintiff complained of pain in his left shoulder, left hip, knees, and feet. (AR 60-63.) He testified that the pain in his hip, shoulder, and knee "comes and goes with the weather." (*Id.*) During the period from August 2009 to June 2012, Plaintiff suffered hip pain every day that he had to walk, but now the pain "is not as bad as it used to be." (AR 72.) He experienced pain in his feet only if he "walk[s] [more than] ten miles." (AR 60.) With regard to his shoulder pain, Plaintiff has difficulty lifting his arm over his head. (AR 61.) To alleviate his various pains, Plaintiff takes Motrin. (AR 62.) To manage the pain in his feet, Plaintiff wears supportive boots. (AR 60.) Plaintiff testified of numbness in his hands, as well, but that a nerve conduction test revealed no nerve problems. (AR 63.) Plaintiff testified that he suffers chronic lower back pain and occasional higher back pain. (AR 60.) He experiences pain three to four times per week, lasting a few hours, and usually only when he wakes in the morning. (AR 61, 71.) Plaintiff takes Motrin, but the pain usually subsides when he gets out of bed. (AR 72.) At the time of the hearing, Plaintiff was not taking any other pain medication. (AR 62.) He testified that he does not use heat, ice, or other topical treatments such as Icy Hot, because he has had a reaction to them. (*Id.*) Plaintiff used a walker for two years, but currently uses a cane "every now and again." (AR 71.)

Plaintiff further complained that he suffers from asthma. (AR 62.) Plaintiff testified at the hearing that he recently presented at the Veteran's Administration ("VA") hospital for a breathing check, and was diagnosed with 25 percent lung blockage. (*Id.*) Plaintiff was prescribed an inhaler, which he uses twice a day. (*Id.*)

Plaintiff suffers seizures, which cause him to blackout, three to four times per week.[8] (AR 59, 71.) Plaintiff's seizures are not being treated with any medication because his neurologist has been unable to identify their cause. (AR 59-60.) Plaintiff also complained of headaches at least once a week. (AR 61.) He takes Motrin, which "seems to help it subside." (AR 62.)

---

[8] Plaintiff's wife, Andrea McDonald, testified that, during the period from August 2009 to June 2012, Plaintiff's seizures occurred during the day and night. (AR 74, 77.) At the time of the hearing, however, Plaintiff's seizures were occurring mostly during the night. (*Id.*)

With regard to his mental impairments, Plaintiff testified that he has been diagnosed with depression and post-traumatic stress disorder ("PTSD"). (AR 64, 72.) Plaintiff described having flashbacks of his experiences in the U.S. Navy three to four times per day, and occasional nightmares.[9] (AR 64, 68.) At the time of the hearing, Plaintiff was not being treated medically for his depression and PTSD. (AR 64.) He testified that he ceased taking medication because it caused his depression to worsen and affected his ability to walk. (AR 66-67.)

Plaintiff was being treated by Dr. DeCarvalho, a psychologist at Adventist Health, who diagnosed his PTSD, but ceased his treatment with her when she transferred to San Francisco. (AR 67.) Plaintiff testified that his symptoms related to PTSD improved while Dr. DeCarvalho was treating him. (*Id.*) Plaintiff attempted to continue his mental health treatment after Dr. DeCarvalho left Adventist Health, to no avail. (AR 68.) He testified that, eventually, he was transferred to Kings County for mental health treatment. (*Id.*) At the time of the hearing, Plaintiff was seeing a counselor at King's county once a month, attending a veteran's support group twice a month, and was planning to participate in a trauma support group. (AR 64, 67.) Plaintiff testified that his symptoms related to depression and PTSD have not improved. (AR 65.)

With regard to his limitations, Plaintiff testified that he can walk a mile a day, and can stand or sit for 15 minutes at a time. (AR 63.) Plaintiff can squat, bend, and climb stairs. (*Id.*) Plaintiff's back pain limits him to lifting no more than 15 pounds. (AR 61.) Plaintiff has difficulty sleeping most nights—he testified that he sleeps maybe six hours on those nights. (AR 69.) Plaintiff has difficulty with memory and concentration. (AR 65, 69-70.) His wife manages most of the finances. (AR 65.) Plaintiff admitted that he drinks alcohol, but that he no longer drinks heavily. (AR 65-66.)

With regard to daily activities, Plaintiff testified that he typically awakens at 5:30 or 6:00 a.m., makes breakfast, reads emails, sometimes cleans the kitchen, and relaxes for the remainder of the morning. (AR 55.) He then prepares lunch, attends any scheduled medical appointments, relaxes for the remainder of the afternoon, and sleeps around 8:00 p.m. (AR 55-

---

[9] Plaintiff's wife testified that Plaintiff's symptoms related to PTSD had improved. (AR 79.)

56.) Plaintiff explained that when he relaxes, he usually watches television, reads the news on the internet, or reads a book. (AR 55.) Plaintiff performs household chores in moderation, regularly grocery shops, and performs yard work in moderation. (AR 54.) He testified that he can shower and dress without assistance. (AR 45.) Plaintiff attends church, and he attends his children's school activities when he can. (AR 55.) Plaintiff sometimes drives, sometime walks, and sometimes exercises at the gym. (AR 53, 56.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a security guard, Dictionary of Operational Titles ("DOT") code 372.667-031, light work with a specific vocational preparation ("SVP") of 3; a gate guard, DOT code 372.667-030, light work with an SVP of 3; an examiner, DOT code 169.267-014, sedentary work with an SVP of 6; a technical support specialist, DOT code 033.162-018, light work with an SVP of 7; a power plant mechanic, DOT code 621.281-014, medium work (but heavy work as specifically performed by Plaintiff) with an SVP of 7; and an office manager (government service), DOT code 188.167-058, sedentary work with an SVP of 8. (AR 82-85.)

The ALJ posed a series of hypothetical questions to the VE. In the first hypothetical, the ALJ asked the VE whether a person of Plaintiff's age, education, and work history can perform Plaintiff's past work if such a person is capable of lifting 50 pounds occasionally, 25 pounds frequently, and can sit, stand, or walk six to eight hours in an eight-hour work day with frequent stopping, crouching, crawling, climbing, and kneeling. (AR 86.) The VE testified that such a hypothetical person could perform the jobs of office manager (government service), examiner, security guard, gate guard, and technical support specialist. (AR 87.) The VE testified that such a person could perform the job of power plant mechanic as defined by the DOT, but that such a person could not perform the job as it was performed by Plaintiff. (*Id.*)

The ALJ posed a second hypothetical to the VE, considering the same person outlined above, but with the following limitations: lifting only 20 pounds occasionally; lifting 10 pounds frequently; sitting, standing, or walking six to eight hours in an eight-hour work day; avoiding climbing ladders, ropes, or scaffolds; avoiding heights; avoiding dangerous machinery; avoiding

concentrated exposure to dust, gases, and fumes. (AR 87.) The VE testified that such a person could perform Plaintiff's past work as an office manager (government service), examiner, and technical support specialist. (*Id.*)

The ALJ posed a third hypothetical, considering the same person with the same limitations outlined in the second hypothetical, but with the added limitation of performing only simple routine tasks. (AR 87.) The VE testified that such a person would not be able to perform any of Plaintiff's past work. (AR 88.) Such a person would, however, be capable of performing the following jobs: (1) mail clerk, DOT code 209.687-026, unskilled, light work, SVP of 2, for which there exists 6,812 jobs in California, and "about nine times [that nationally]"; (2) marker or price marker, DOT code 209.587-034, unskilled, light work, SVP of 2, for which there exists 24,867 jobs in California, and "about nine times [that nationally]"; routing clerk, DOT code 222.587-038, unskilled, light work, SVP of 2, for which there exists 31,431 jobs in California, and "about nine times [that nationally]". (AR 88.)

The ALJ posed a fourth hypothetical, considering the same person with the same limitations outlined in the second hypothetical (*i.e.*, not limited to simple routine tasks), but with the added limitation of lifting only 10 pounds frequently; sitting, standing, or walking two hours in an eight-hour work day; occasionally climbing, balancing, kneeling, crouching, and crawling; and avoiding heights and dangerous machinery. (AR 88-89.) The VE testified that such a person could perform Plaintiff's past work as an office manager (government service) and an examiner. (AR 89.)

The ALJ posed a fifth hypothetical, considering the same person with the same limitations outlined in the fourth hypothetical, but with the added limitation of "be[ing] off task 20% of the day." (AR 89.) The VE testified that there would be no work for such a person. (*Id.*) The ALJ asked a sixth hypothetical, considering the same person outlined in the fourth hypothetical, but with the added limitation of missing "about four days a month." (*Id.*)

## C.     The ALJ's Decision

In a decision dated April 11, 2014, the ALJ found Plaintiff not disabled. (AR 30-41.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (*See*

*generally* AR 31-32.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset disability date of August 27, 2009 to his last insured date of June 30, 2012.  (AR 32.)  The ALJ found that Plaintiff had the following severe impairments: obesity; history of cervical spondylosis; early degenerative tearing of the left hip labrum; psychogenic seizures; conversion disorder; post-traumatic stress disorder; depression; and asthma.  (*Id.*)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (*Id.*)

At Step Four of the sequential analysis, the ALJ determined that Plaintiff had the RFC

> to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six to eight hours in an 8-hour day, and stand and walk for six to eight hours in an 8-hour day.  He can frequently stop, crouch, crawl, climb, kneel, and cannot climb ladders, ropes, or scaffolds, or be around heights and dangerous machinery.  He should avoid concentrated exposure to fumes, gases, and dust.

(AR 35.)  In reaching this determination, the ALJ discredited Plaintiff's subjective complaints as inconsistent with the residual functional capacity assessment.  (AR 36.)  In particular, the ALJ noted that Plaintiff's medical treatment had been conservative; his daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations; his complaints were not supported by the objective medical evidence in the record; and he had not fully complied with his treatment.  (AR 36-37.)  The ALJ also discredited Plaintiff's treating psychologist, Dr. Lorie DeCarvalho, finding that her opinion was "not consistent with [Plaintiff's] stopping treatment and his daily activities."  (AR 38.)  However, the ALJ afforded great weight to the opinions of consultative examining psychologist Dr. Hirokawa, non-treating examining physician Dr. Verma, and treating neurologist Dr. Catherine Yen; less weight to the opinions of qualified medical examiner Dr. Sanjay Deshmukh and treating physician Dr. David Pingitore; and little weight to the state agency physicians.  (AR 38-39.)

Finally, the ALJ determined that, through the date last insured, Plaintiff was unable to perform any past relevant work, but that, given his RFC, he was not disabled because he could

perform a significant number of jobs in the local and national economies. (AR 25.) Specifically, the ALJ found that Plaintiff could perform the jobs of mail clerk, DOT code 209.687-026, marker, DOT code 209.687-034, and routing clerk, DOT code 222.587-038. (AR 39-40.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on August 17, 2016. (AR 1-7.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

**D.     Plaintiff's Appeal**

On October 3, 2016, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the ALJ (1) erred in discrediting the mental function assessment of treating psychologist Dr. DeCarvalho; (2) failed to adopt state agency psychologist Dr. Hirokawa's assessment of Plaintiff's mental function limitations, despite the ALJ's statement that she afforded great weight to Dr. Hirokawa's opinion, and failed to articulate any reasons for such an omission; and (3) failed to articulate clear and convincing reasons for discrediting Plaintiff's subjective complaints. (*See generally* Doc. 9 at 14-22.)

## III.     SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts

from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.     APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities.   *Id*. §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work.   *Id*. §§ 404.1520(f), 416.920(f).   If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id*. §§ 404.1520(g),

416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.    DISCUSSION

### A.    The ALJ's Consideration of the Medical Opinions

Plaintiff contends that the ALJ failed to articulate specific and legitimate reasons for discrediting the mental function assessment of treating psychologist Dr. DeCarvalho.  (Doc. 9 at 15-16.)  The Commissioner counters that the ALJ permissibly rejected Dr. DeCarvalho's opinion because it was inconsistent with Plaintiff's treatment history, his daily activities, and the medical evidence in the record—particularly the opinions of Dr. Lissaur and Dr. Hirokawa.  (Doc. 12 at 17-18.)    Plaintiff further contends that the ALJ failed to adopt state agency examining psychologist Dr. Hirokawa's assessment of Plaintiff's mental function limitations, despite the ALJ's statement that she afforded great weight to Dr. Hirokawa's opinion, and that the ALJ failed to articulate any reasons for such an omission.  (Doc. 9 at 16-17.)  The Commissioner counters that there is no inconsistency between the ALJ's statement that she afforded great weight to Dr. Hirokawa, Dr. Hirokawa's assessment, and the ALJ's RFC finding.  (Doc. 12 at 20.)

### 1.    Legal Standard

The ALJ must consider and evaluate every medical opinion of record.  *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Madrigal v. Berryhill*, No. CV 16-8714-E, 2017 WL 3120257, at *3 (C.D. Cal. Jul. 21, 2017).    In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason."  *Madrigal*, 2017 WL 3120257, at *3 (quoting *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981)).  Nor can the ALJ make his or her own lay medical assessment.  *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (a hearing examiner not qualified as a medical expert should not make his or her own exploration and assessment of a claimant's medical condition) (citation omitted).

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a

physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13-cv-01577-SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

**2.    The ALJ Did Not Err In Discrediting the Opinion of Treating Psychologist Dr. DeCarvalho.**

It is uncontested that Dr. DeCarvalho treated Plaintiff, and thus is considered a treating physician. (*See, e.g.*, AR 33.) "[C]lear and convincing reasons are required to reject the treating doctor's ultimate conclusions . . . Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record for so doing." *Lester v. Chater*, 81 F.3d 821, 830-31 (quotation marks and citations omitted). Nonetheless, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009)).

With regard to Plaintiff's mental function limitations, Dr. DeCarvalho opined that Plaintiff was not capable of maintaining regular employment, because his impairments would likely cause him to be absent from work more than three times per month, and he was unable to handle even low stress. (AR 1012-13.) The ALJ found that Dr. DeCarvalho's opinion was inconsistent with the objective medical evidence in the record, with Plaintiff's daily activities, and with his failure to adhere to his treatment. (AR 38.) The Court finds the ALJ's reasons to

1 | be specific and legitimate.

2 | **a.** **Dr. DeCarvalho's Opinion Conflicted with Other Medical Opinions.**

3 As the ALJ noted, Dr. DeCarvalho's opinion of Plaintiff's mental function limitations is
4 not consistent with that of other examining physicians. After an examination in 2010, Dr.
5 Pingitore opined that, although Plaintiff was partially psychiatrically disabled, Plaintiff could
6 perform the clerical and computer-based aspects of his job, as evidenced by his level of daily
7 activity and cognitive skills. (AR 752.) In 2011, Dr. Pingitore opined that Plaintiff had no
8 work restrictions related to psychiatric injury and that he had no temporary or permanent
9 disability. (AR 766-67; *see Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007) ("[W]hen an
10 examining physician provides 'independent clinical findings that differ from the findings of the
11 treating physician,' such findings are 'substantial evidence.").

12 Similarly, Dr. Hirokawa opined that, despite Plaintiff's mental function limitations,
13 Plaintiff could still function well or satisfactorily. (*See* AR 1155); *see also Orn*, 495 F.3d 625.
14 In particular, Dr. Hirokawa found that Plaintiff had only mild to moderate impairment in his
15 ability to follow simple instructions, follow complex or detailed instructions, maintain adequate
16 pace or persistence to perform one- or two-step simple repetitive tasks and complex tasks,
17 maintain adequate attention or concentration, interact appropriately with co-workers,
18 supervisors, and the public on a regular basis, engage in social judgment and awareness of
19 socially appropriate behavior, and function independently and sustain an ordinary routine
20 without special supervision. (AR 1155.) Dr. Hirokawa further found that Plaintiff had only
21 moderate impairment in his ability to adapt to changes in job routine, withstand the stress of a
22 routine workday, accept instructions from a supervisor and respond appropriately to criticism,
23 and emotionally managing a work environment. (*Id*.)

24 Where there are contradicting opinions, as is the case here, the ALJ is charged with
25 resolving the conflict, which she did. *See Cookson v. Comm'r of Soc. Sec.*, No. 2:12-cv-2542-
26 CMK, 2014 WL 4795176, at 4 (E.D. Cal. Sept. 25, 2014); *see also Andrews v. Shalala*, 53 F.3d
27 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving
28 conflicts in the medical testimony, and for resolving ambiguities. We must uphold the ALJ's

decision where the evidence is susceptible to more than one rational interpretation."); *Corn v. Astrue*, No. 1:11–cv–00888 AWI GSA, 2012 WL 2798802, at *13 (E.D. Cal. July 9, 2012) ("To the degree there are conflicts in the medical evidence, it is the ALJ's responsibility to resolve such conflicts." (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989))); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are . . . unsupported by the record as a whole . . . or by objective medical findings." (citations omitted)); *Mitchell v. Astrue*, No. ED CV 09-1258-PLA, 2010 WL 1994695, at *4 (C.D. Cal. May 14, 2010) ("The inconsistency of [the physician's] opinion with the objective [test] results and the medical evidence as a whole was a legitimate reason supported by substantial evidence for the ALJ to discredit the doctor's opinion." (citing 20 C.F.R. § 404.1527(d)(4))). The ALJ therefore reasonably resolved the conflict between Dr. DeCarvalho's opinion and the opinions of Drs. Pingitore and Hirokawa by affording greater weight to Drs. Pingitore and Hirokawa, and the Court will not disturb this finding. Accordingly, the Court finds that the ALJ's first stated rationale for discrediting Dr. DeCarvalho's opinion is a valid specific and legitimate reason to reject that opinion.

### b. Dr. DeCarvalho's Opinion Conflicted with Plaintiff's Daily Activities and His Noncompliance with Treatment.

The Court further finds that the inconsistency between Plaintiff's activities of daily living and failure to adhere to his treatment regimen, on one hand, and Dr. DeCarvalho's opinion of Plaintiff's mental function limitations, on the other hand, is also a valid specific and legitimate reason to reject Dr. DeCarvalho's opinion.

First, as the ALJ noted, Plaintiff reported that his daily activities consisted of making breakfast and lunch, showering and dressing without assistance, and cleaning the kitchen. (AR 53-56.) Dr. DeCarvalho's treatment notes on December 6, 2011, state that Plaintiff reported "doing good." (AR 769.) Dr. DeCarvalho's treatment notes for each examination of Plaintiff from January 2012 through April 2012, assess Plaintiff as psychologically stable and note that Plaintiff reported doing "good" and "alright." (AR 497, 526, 1135, 1137, 1141.) Yet, in her opinion of Plaintiff's mental function limitations on December 11, 2011, Dr. DeCarvalho found

that Plaintiff was *markedly* limited in adhering to basic standards of neatness and cleanliness. (AR 1009-1111.) The ALJ was not incorrect in finding this to be inconsistent. *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may find that the claimant's reported participation in everyday activities indicates capacities that are transferable to a work setting." (internal quotation and citations omitted)).

Plaintiff further reported that he performed yard work, regularly grocery shopped, attended church, attended his children's school activities when possible, sometimes drove, sometimes walked, sometimes exercised at the gym, used the computer, watched television, and read books. (AR 45, 53-56.) Dr. DeCarvalho, however, found that Plaintiff was *markedly* limited in understanding, remembering, and carrying out one or two step instructions and detailed instructions; maintaining attention and concentrating for extended periods; performing activities within a schedule; maintaining regular attendance, being punctual within customary tolerances; sustaining an ordinary routine without supervision; working in coordination with or in proximity to others without being distracted by them; and making simple work-related decisions. (AR 1009-1111.) It was reasonable for the ALJ to conclude that Plaintiff's reports of such daily activities conflicted with Dr. DeCarvalho's opinion of Plaintiff's mental function limitations. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (stating that a conflict between a physician's opinion and a claimant's daily activities "may justify rejecting a treating provider's opinion" (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-02 (9th Cir. 1999))); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (finding that the ALJ gave specific and legitimate reasons for rejecting the opinion of a treating physician where "the restrictions" included in the opinion "appear[ed] to be inconsistent with the level of activity that [the claimant] engaged in"); *see also*, *e.g.*, *Hutcheson v. Comm'r of Soc. Sec.*, No. 1:16-cv-00366-SKO, 2017 WL 3839956, at * 8 (E.D. Cal. Sept. 1, 2017) (finding that the ALJ properly discredited treating physician's opinion as inconsistent with Plaintiff's daily activities where physician opined that claimant suffered severe limitations but claimant reported driving, cooking, washing dishes, doing laundry, and grocery shopping).

Second, it was reasonable for the ALJ to conclude that Dr. DeCarvalho's opinion of Plaintiff's mental function limitations was undermined by the "evidence that [Plaintiff] ha[d] not been entirely compliant in taking prescribed medications." (AR 37.) In early 2011, Plaintiff reported to Dr. DeCarvalho that he was taking a reduced dosage of his medication, and that his mood was stable. (AR 573-75, 581.) In August 2011, Plaintiff reported to Dr. DeCarvalho that he had discontinued his medications due to side effects, including limb weakness, lethargy, decreased appetite, and upset stomach. (AR 557.) As the ALJ noted, in May 2012, Plaintiff was not taking his Androgel medication consistently and he was not using his walker. (AR 1146.) In December 2012, Plaintiff reported to state agency internist Dr. Verma that he stopped taking his medication for a year, and that he was doing "okay." (AR 1161-62.)

As the ALJ found, Plaintiff's lack of compliance with his treatment suggests that his symptoms may not have been as limiting as he alleged—and certainly not as limiting as Dr. DeCarvalho opined. (*See* AR 37); *see also Cohn v. Berryhill*, No. 2:16-cv-07352-GJS, 2017 WL 4772398, at *4 (C.D. Cal. Oct. 20, 2017) (finding that the claimant's "unexplained failures to take prescribed hypertension and diabetes medication on a regular basis and to keep his appointments for medical tests, as well as Plaintiff's conservative treatment despite his allegedly disabling symptomatology are clear and convincing reasons for discounting Plaintiff's reported symptoms"). Moreover, the fact that Plaintiff reported doing "okay," and that he was "stable" during these periods of noncompliance with his medications, further indicates that his symptoms were less limiting than Dr. DeCarvalho opined. *See*, *e.g.*, *Vongdeng v. Colvin*, 2:15-cv-1071-CKD, 2016 WL 3126121, at *4 (E.D. Cal. Jun. 2, 2016) (finding that the ALJ properly discredited treating physician's opinion where it was undermined by Plaintiff's history of noncompliance with treatment and Plaintiff's simultaneously improved symptoms).

In summary, the Court finds that each of the ALJ's stated bases for discrediting Dr. DeCarvalho's opinion regarding Plaintiff's mental function limitations are supported by substantial evidence.

//

### 3. The ALJ Did Not Err In Her Credibility Determination Concerning State Agency Psychologist Dr. Hirokawa.

Dr. Hirokawa examined Plaintiff, and thus is considered a non-treating, examining physician. (*See, e.g.*, AR 34.) "As in the case with the opinion of a treating physician, the Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician." *Lester*, 81 F.3d at 830 (citation omitted). "And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31 (citation omitted). As stated above, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry*, 688 F.3d at 671 (quoting *Bray*, 554 F.3d at 1228).

Dr. Hirokawa found that Plaintiff experienced mild to moderate and fully moderate impairment in the work-related tasks set forth above and below. (*See* AR 1155.) The ALJ afforded great weight to Dr. Hirokawa's findings regarding Plaintiff's mental function limitations. (AR 38.) Plaintiff contends that, despite the ALJ's crediting of Dr. Hirokawa's findings, the ALJ failed to adopt any of his findings in her RFC assessment. (Doc. 9 at 19.) Plaintiff's argument is unconvincing.

Dr. Hirokawa's findings are not inconsistent with the ALJ's ultimate RFC assessment, and instead support the ALJ's assessment. Dr. Hirokawa expressly defined "mild" as "some limitations, but [the] individual can generally function well," and "moderate" as "moderate limitation in this area, but the individual is still able to function satisfactorily." (AR 1155.) Nothing in these definitions of "mild" and "moderate" contradicted the ALJ's RFC assessment that Plaintiff could, for instance, "lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six to eight hours in an 8-hour day, and stand and walk for six to eight hours in an 8-hour day." (AR 35); *see Davis v. Comm'r of Soc. Sec.*, No. 2:12-cv-766-KJN, 2016 WL 3688416, at *4 (E.D. Cal. Jul. 11, 2016) ("The ALJ's RFC was not required to match the opinion of any particular source, and the ALJ is obligated to consider the record as a whole."); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) ("It is not necessary to agree with everything an expert witness says in order to hold that his testimony contains substantial

evidence.").

In fact, Dr. Hirokawa's findings that Plaintiff could function well or satisfactorily are consistent with the ALJ's assessment, especially in light of the ALJ's assessment that Plaintiff "cannot climb ladders, ropes, or scaffolds, . . . be around heights and dangerous machinery . . . [and that] [h]e should avoid concentrated exposure to fumes, gases, and dust." (AR 35.) As the Commissioner notes, the Ninth Circuit has held that a physician's finding of moderate limitations in a claimant's mental functioning does not necessarily preclude the ALJ from determining that the claimant can work beyond the exertional limitations identified by the ALJ. *See Hoopai v. Astrue*, 499 F.3d 1071, 1077 (9th Cir. 2007).

As there was no inconsistency between Dr. Hirokawa's findings of mild and moderate limitations to Plaintiff's mental function limitations and the ALJ's RFC assessment, the ALJ did not discredit Dr. Hirokawa's findings by failing to mention them. The Court therefore finds that the ALJ's determination of Dr. Hirokawa's credibility is supported by substantial evidence.

**B.      The ALJ's Consideration Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for discrediting Plaintiff's testimony regarding the severity and extent of his pain and symptoms. (Doc. 16 at 21.) The Court disagrees. (*See generally* AR 18-22.)

**1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-prong analysis. *Vasquez*, 572 F.3d at 591; *Bunnell*, 947 F.2d at 344. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Vasquez*, 572 F.3d at 591. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [she] has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the

rejection. *Id.*

As to the second prong, "[t]he clear and convincing standard is 'not an easy requirement to meet' and it 'is the most demanding standard required in Social Security cases.'" *Wells v. Comm'r of Soc. Sec.*, No. 1:17-cv-00078-SKO, 2017 WL 3620054, at *6 (E.D. Cal. Aug. 23, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted). "[R]ather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see*, *e.g.*, *Vasquez*, 572 F.3d at 592 ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than she claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993))); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

### 2. The ALJ Properly Discounted Plaintiff's Subjective Complaints.

The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, . . . [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the [ALJ's] residual functional capacity assessment." (AR 36.) The ALJ provided the following reasons for this finding: (1) Plaintiff's medical treatment had been conservative and Plaintiff had a history of noncompliance with his treatment regime; (2) Plaintiff's activities of daily living were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; and (3) Plaintiff's "allegations of severe symptoms [were] not supported by the clinical evidence." (AR 36-37.)

### a. Conservative Treatment

The ALJ found Plaintiff's treatment to be conservative because (1) he had not received treatment consistent with chronic pain such as biofeedback, acupuncture, physical therapy, or attendance at a pain management clinic, and (2) his symptoms improved with a left hip injection in August 2009, his use of a walker, and his use of a TENS unit in August 2011. (AR 36.)

Plaintiff contends that his prescription treatments of Vicodin and Lyrica were consistent with his subjective complaints, and that his purportedly partial improvement as a result of these treatments did not undermine his subjective complaints. (Doc. 9 at 21-22.) The Court disagrees with Plaintiff's position.

"The treatment [a claimant] received, especially when conservative, is a legitimate consideration in a credibility finding." *McKnight v. Comm'r of Soc. Sec.*, No. 1:12-cv-00726-AWI-JLT, 2013 WL 12073218, at *2 (E.D. Cal. Sept. 2013) (citing *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999)). In other words, "[t]he conservative nature of [a] plaintiff's treatment provides a clear and convincing reason for rejecting [a] plaintiff's statements concerning the severity of her impairments." *Bifarella v. Colvin*, 51. F. Supp. 3d 926, 935 (E.D. Cal. 2014) (citing *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)); *see also*, *e.g.*, *Parra*, 481 F.3d at 751 ("[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." (citation omitted)).

Here, as the ALJ noted, Plaintiff had been treating his neck, shoulder, and back pain in August 2011 with an over-the-counter TENS unit, which the Ninth Circuit has characterized as conservative treatment. (*See* AR 1091-1109); *see also Johnson v. Shalala,* 60 F.3d 1428, 1432 (9th Cir. 1995) ("'Conservative treatment' has been characterized by the Ninth Circuit as, for example, 'treat[ment] with an *over-the-counter pain medication*'.") (quoting *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir.2007)) (emphasis added)). Plaintiff responded positively to treatment with a TENS unit. (AR 1091-1109). The Ninth Circuit has repeatedly found that treatment was conservative when the claimant's pain was adequately treated with over-the-counter medication and other minimal treatment. *See*, *e.g.*, *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008) (treatment was conservative where claimant took only Ibuprofen to treat his pain); *Tommasetti*, 533 F.3d at 1040 (claimant's favorable response to physical therapy, anti-inflammatory medication, a TENS unit, and lumbosacral corset was conservative treatment). Plaintiff's hip pain was also successfully treated with a conservative treatment regime. In August 2009, Plaintiff received a left hip injection, which resulted in "good relief." (AR 36.) Courts have found that successful management of a

claimant's pain symptoms through "prescription medications and infrequent epidural and cortisone injections" constitutes "conservative treatment," and is therefore a sufficient reason for the ALJ to discount the claimant's subjective pain complaints. *Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014). Further, as the ALJ correctly noted, Plaintiff's lack of participation in a pain management program—and notably, his successful use of Motrin to manage the *entirety* of his pains—also indicates that his treatment was conservative. (AR 62, 72); *see, e.g.*, *Osenbrock v. Apfel*, 240 F.3d 1157, 1165–66 (9th Cir. 2001) (finding that the ALJ did not err in making an adverse credibility finding where the ALJ stated, in part, that "the claimant has not participated in any significant pain regimen or therapy program").

Plaintiff's argument that Vicodin and Lyrica are not conservative prescription treatments is unavailing. *See Walter v. Astrue*, No. EDCV 09–1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection); *see also, e.g.*, *Martin v. Colvin*, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017) ("Courts have frequently found that the fact that Plaintiff has been prescribed narcotic treatment or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods." (emphasis in original) (citing *Huizar v. Comm'r*, 428 Fed. Appx. 678, 680 (9th Cir. 2011) (finding that plaintiff responded favorably to conservative treatment, which included "the use of narcotic/opiate pain medications")); *Zaldana v. Colvin*, No. CV 13–7820 RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (finding that evidence of treatment including Tramadol, ibuprofen, and "multiple steroid injections" was "a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination because the record reflects that plaintiff was treated on the whole with conservative care for her foot pain with good results and improvement."); *Jones v. Comm'r of Soc. Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7-10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and

narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility); *Higinio v. Colvin*, No. EDCV 12–1820 AJW, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014) (holding that despite the fact that the claimant had been prescribed narcotic pain medication at various times, the claimant's overall treatment—which also included use of a back brace and a heating pad—was conservative).

Moreover, Plaintiff's history of noncompliance with his treatment regime—especially while he was simultaneously reporting an improvement in his symptoms—supports the ALJ's finding that Plaintiff's treatment was conservative. "According to agency rules, 'the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."' *Molina*, 674 F.3d at 1113 (quoting SSR 96-7p).

As set forth above, Plaintiff reported to Dr. DeCarvalho in early 2011 that he was taking a reduced dosage of his medication, and that his mood was stable. (AR 573-75, 581.) In August 2011, Plaintiff reported to Dr. DeCarvalho that he had discontinued his medications due to side effects, including limb weakness, lethargy, decreased appetite, and upset stomach. (AR 557.) As the ALJ noted, in May 2012, Plaintiff was not taking his Androgel medication consistently and he was not using his walker. (AR 1146.) In December 2012, Plaintiff reported to state agency internist Dr. Verma that he stopped taking his medication for a year, and that he was doing "okay." (AR 1161-62); *see also Cohn*, 2017 WL 4772398, at *4 (finding that the claimant's "unexplained failures to take prescribed hypertension and diabetes medication on a regular basis and to keep his appointments for medical tests, as well as Plaintiff's conservative treatment despite his allegedly disabling symptomatology are clear and convincing reasons for discounting Plaintiff's reported symptoms"); *Hutcheson*, 2017 WL 3839956, at *4 (finding that the ALJ properly discredited treating physician's opinion where it was undermined by Plaintiff's history of noncompliance with treatment and Plaintiff's simultaneously improved symptoms). The ALJ was therefore entitled to discount Plaintiff's credibility based on this conservative treatment and Plaintiff's positive response to it.

Even if Plaintiff's treatment were not considered conservative, remand would not be warranted because the remainder of the ALJ's credibility finding as set forth below were supported by ample evidence in the record. *See Batson v. Comm'r Soc. Sec.*, 359 F. 3d 1190, 1197 (9th Cir. 2004)) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal."); *Tonapetyan v. Halter,* 242 F. 3d 1144, 1148 (9th Cir. 2001) (that some reasons for discrediting claimant's testimony should be properly discounted does not render an ALJ's determination invalid so long as that determination is supported by other, substantial evidence). As such, the Court finds that the ALJ's credibility determination based on Plaintiff's conservative treatment was supported by substantial evidence.

### b. Activities of Daily Living

Plaintiff's further contends that "none of [Plaintiff's] activities [of daily living] is actually inconsistent with [Plaintiff's] testimony that he cannot lift more than about 15 pounds, walk more than a mile, or sit or stand for more than 15 minutes." (Doc. 9 at 22.) The Court disagrees.

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferrable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989)); *see also Molina*, 674 F.3d at 1112 ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.") (internal quotation and citations omitted). "Even where those activities suggest some difficulty [in] functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* (citations omitted).

At the hearing, Plaintiff testified that he can walk a mile a day, stand or sit for 15 minutes at a time, squat, bend, and climb stairs, and lift no more than 15 pounds (although earlier in the hearing, he testified that he experiences pain in his feet only if he "walk[s] [more than] ten

miles"). (AR 60-61, 63, 65-66, 69-70.) Plaintiff also testified that he has difficulty sleeping most nights—he sleeps maybe six hours on those nights, and difficulty with memory and concentration. (AR 65, 69-70.) His wife manages most of the finances. (AR 65.) Plaintiff admitted that he drinks alcohol, but that he no longer drinks heavily. (AR 65-66.) The ALJ found, however, that Plaintiff was able to engage in his normal daily activities despite his subjective complaints. (AR 36.) In particular, the ALJ found that Plaintiff was able to play computer games, watch television, wash laundry, wash dishes, vacuum, sweep, prepare simple meals, mow the lawn, garden, walk, leave home alone, shop, exercise at the gym, participates in activities at church, occasionally with his children, and with the Scouts. (AR 36-37.) This Court's recent order in *Martin v. Colvin*, 2017 WL 615196, at *11 (E.D. Cal. Feb. 14, 2017) is instructive. In that case, the claimant was able to run errands using public transportation, read, crochet, watch television, and perform such household chores as cooking, laundry, vacuuming, cleaning the bathtub and shower bench. *Id.* The Court found that such "activities tended to suggest that the claimant may have still been capable of performing the basic demands of unskilled work on a sustained basis." *Id.* Here, Plaintiff engaged in largely the same types of daily activities as the claimant in *Martin* and much more. In addition to the general household chores mentioned by the ALJ, Plaintiff testified at the hearing that he reads the news and emails on his computer, cleans the kitchen, showers and dresses without assistance, and sometimes drives. (AR 45, 53, 55-56.)

As such, the Court finds that such activities of daily living tend to suggest that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the light, unskilled jobs identified by the VE. *See Fair,* 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also*, e.g., *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances);

*Morgan v. Comm'r Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F.App'x 674, 677 (9th Cir. 2012) (holding that ALJ properly made an adverse credibility finding because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Garcia v. Colvin*, No. EDCV 14-2107 AGR, 2015 WL 5568606, at *6 (C.D. Cal. Sept. 22, 2015) (ALJ properly discredited subjective complaints of claimant who suffered from fibromyalgia and rheumatoid arthritis where claimant engaged in light daily activities such as house chores, cooking, vacuuming, mopping, cleaning walls, changing beds, and caring for husband and grandchild); *Ann Cox v. Colvin*, No. 15-cv-00190-JSC, 2015 WL 8596436, at *22 (N.D. Cal. Dec. 14, 2015) (finding ALJ's discrediting of claimant's subject complaints to be proper where claimant, who suffered from fibromyalgia and rheumatoid arthritis, performed household chores, shopped for groceries, performed personal care tasks without assistance, prepared full meals, and drove).

To be sure, the record also contains some contrary evidence, such as Plaintiff's statements regarding his constant pains and mental impairments. However, it is the function of the ALJ to resolve any ambiguities, and the Court finds the ALJ's assessment of Plaintiff's daily activities to be reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### c.     Objective Medical Evidence

Finally, the ALJ did not err in finding that the objective medical evidence fails to support Plaintiff's subjective complaints. (*See* Doc. 9 at 20-21.) While subjective symptom testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining Plaintiff's credibility. *Rollins*, 261 F.3d at 957 (citing 20 C.F.R. § 404.1529(c)(2)); *see Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("[L]ack of medical evidence . . . is a factor that the ALJ can

consider in his credibility analysis.").

Here, the ALJ discounted Plaintiff's credibility because, in part, Plaintiff's "allegations of severe symptoms are not supported by the clinical evidence." (AR 37.) Contrary to Plaintiff's assertion, the ALJ provided ample support for this conclusion, including an extensive discussion regarding the relevant medical evidence during the course of the RFC analysis. (*See* AR 35-39). Plaintiff complained, for instance, of symptoms related to PTSD. (AR 65.) However, Dr. Pingitore made contrary findings. Dr. Pingitore opined that Plaintiff's psychological treatment had been incorrectly directed toward symptoms associated with PTSD instead of conversion disorder, because Plaintiff's "scale scores . . . [were] somewhat exaggerated . . . by [Plaintiff]s broad tendency to magnify the level of experienced illness or a characterological inclination to complain or to be self-pitying." (AR 751, 761.) Dr. Pingitore determined that Plaintiff had no work restrictions related to psychiatric injury. (AR 766-67.) As set forth above, Dr. Hirokawa also opined that Plaintiff had only mild or moderate limitations to his ability to perform work-related tasks. Dr. Lissaur echoed Dr. Pingitore's sentiment, noting that Plaintiff "identifies w[ith] the sick role." (AR 613.)

With regard to Plaintiff' physical impairments, Dr. Ghazal found it inappropriate to issue Plaintiff either a wheelchair or a walker with larger wheels, noting that Plaintiff needed neither to ambulate. (AR 1359.) Indeed, treatment notes from Adventist Health indicate that Plaintiff was not using his walker in May 2012. (AR 1146.) The Court therefore finds that the ALJ's stated rationale pertaining to the objective medical evidence is a valid clear and convincing reason for the ALJ's adverse credibility finding. *See, e.g.*, *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (finding that the "ALJ gave specific, clear and convincing reasons for discounting [the claimant's] testimony" where the ALJ found, in part, that "no objective medical evidence" supported the claimant's "descriptions of her pain and limitations"); *Regennitter v. Commissioner*, 166 F.3d 1294, 1297 (9th Cir. 1998) (explaining that a determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement); *Bifarella*, 51 F. Supp.3d at 934–35 (finding that the ALJ's rationale relating to an inconsistency between the plaintiff's statements and the objective medical evidence was a valid clear and

convincing reason for an adverse credibility finding where the ALJ addressed the pertinent evidence and reached an "interpretation of the objective evidence [that] was reasonable").

In summary, the Court finds that each of the ALJ's stated bases for his credibility determination are supported by substantial evidence. The Court therefore finds that substantial evidence supports the ALJ's ultimate credibility determination and, consequently, that reversal of the ALJ's decision on this ground is not warranted.

## VI.    CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Larry Eugene McDonald.

IT IS SO ORDERED.

Dated:   __March 1, 2018__                    _____/s/ _Sheila K. Oberto_____
                                                     UNITED STATES MAGISTRATE JUDGE